## THE STATE v. KEYES, Appellant.

### Division Two, May 22, 1906.

1. **OBTAINING MONEY BY FALSE PRETENSES: Failure to Investigate: No Excuse.** Where false and fraudulent representations are calculated to deceive the person to whom they were made, and are not absurd or irrational, and the party relying upon them has not the means at hand at the time to detect their falsity, the failure of such party to make an investigation to ascertain the truth or falsity of the representations constitutes no defense to the party making them.

2. ———: **Sufficiency of Evidence.** Evidence *held* sufficient to support the verdict finding defendant guilty of obtaining money and property by means of false and fraudulent representations.

3. ———: **Instruction.** An instruction, numbered one, set out in the statement, *held* to state every essential fact necessary to constitute the offense of obtaining money or property under false pretense.

4. ———: ———: **Province of Court and Jury.** It is the province of the jury to determine whether or not the false representations as charged were made. But whether the representations are absurd or irrational, and whether the party relying upon them should have made an investigation as to their truth or falsity, are legal questions for the determination of the court; and, therefore, the court did not err in not submitting such questions to the jury.

5. ———: **Charging Several Pretenses: Proof of One.** In a prosecution for obtaining money or property under false pretenses, when several such pretenses are charged, the proof of any one will sustain the charge; and an instruction which so declares is not erroneous.

Appeal from St. Louis City Circuit Court.—*Hon. Robt. M. Foster,* Judge.

AFFIRMED.

*C. Porter Johnson* and *James D. Simms* for appellant.

(1) Where a party can reasonably under the circumstances protect himself from a false pretense, he

should do so. Com. v. Grady, 13 Bush (Ky.) 285; State v. Green, 7 Wis. 676; Buckalue v. State, 11 Tex. App. 352; Com. v. Gray, 76 Ky. 285; Com. v. Hutchinson, 2 Par. (Pa.) Sel. Eq. Cas. 309; Com. v. Haughty, 3 Metc. 223; State v. Young, 76 N. C. 258; State v. Norton, 11 Allen (Mass.) 266; Henshaw v. Bryant, 4 Scam. 109. (2) The instructions given by the court were erroneous. (a) The court did not properly define the offense of obtaining money or property by false pretenses. In fact it did not attempt to instruct the jury what the law is that the defendant is charged with having violated. (b) The court wholly failed to instruct the jury that any duty rested upon Perry to investigate the alleged representations claimed to have been made by the defendant, and especially if the means were at hand for Perry to have done so before the consummation of the alleged transaction. (c) The court instructed the jury that if either one or all of the alleged representations made by the defendant were relied on and believed to be true by the prosecuting witness, and he was deceived thereby and parted with his money and the checks and drafts mentioned, then the defendant should be convicted. It would seem unnecessary to point out the fallacy of this instruction. It is apparent at the most causal glance.

*Herbert S. Hadley,* Attorney-General, and *Frank Blake,* Assistant Attorney-General, for the State.

(1) The transaction was neither absurd nor irrational, neither did the prosecuting witness have the means at hand to detect the fraud. (2) Section 1927, Revised Statutes 1899, "was enacted to punish those who obtained or attempted to obtain from any other person his money, property or valuable thing, by means or by use of some one of the fraudulent devices enumerated in the act itself. The two essentials of the offense are, first, the obtaining or attempting to obtain goods

or other valuable thing; and second, accomplishing it by some of the means denounced in the statute." State v. Willard, 109 Mo. 247; Watson v. People, 87 N. Y. 566; Clark & Marsh. on Crimes, pp. 831-833; State v. Janson, 80 Mo. 97; State v. Lichleter, 95 Mo. 402; State v. Vandenburg, 159 Mo. 230; State v. Hubbard, 170 Mo. 346. (3) It would be difficult to conceive of any definition of this crime which was not included in the first instruction given by the court. It has been decided that it is not necessary to define the term "false pretenses." State v. McChesney, 16 Mo. App. 269. (4) Another error assigned is the action of the court in instructing the jury that if either one or all of the alleged representations made by the defendant were relied upon and believed to be true, and he was deceived thereby, then the defendant should be convicted. This instrucion states the law as it has been announced in the following authorities: Kelley's Crim. Law & Prac., sec. 697, p. 480; State v. Vorback, 66 Mo. 172.

FOX, J.—This cause is brought here upon appeal from a judgment of the circuit court of the city of St. Louis, convicting the defendant of obtaining money under false and fraudulent representations. The offense, omitting formal parts, is charged as follows by the circuit attorney of the city of St. Louis:

"Comes now Arthur N. Sager, circuit attorney within and for the city of St. Louis, said city of St. Louis being the eighth judicial district of the State of Missouri, and now here in court, upon his official oath, and on behalf of the State of Missouri, information makes, that Thomas P. Keyes, on or about the sixth day of July, one thousand nine hundred and four, at the city of St. Louis aforesaid, feloniously, designedly, knowingly and fraudulently, with the intent then and there to cheat and defraud one William Perry did falsely represent, pretend and state, to the said William Perry (that a certain corporation known and named the St.

Louis Cement Brick Manufacturing Company, and incorporated and existing under the laws of the State of Missouri, then and there had a capital stock of fifty thousand dollars fully paid up); (that said corporation was then and there in good and solvent condition and circumstances, and doing a good business); (that said corporation, the St. Louis Cement Brick Manufacturing Company, had a brick-manufacturing plant, at which plant said corporation was then and there manufacturing fifty thousand brick per day by steam power),(and that he, the said Thomas P. Keyes, was then and there the owner of twenty certain shares of the capital stock of said corporation, and that the said twenty shares of stock were then and there of the value of two thousand dollars); and the said William Perry, believing the said false pretenses and representations so made by the said Thomas P. Keyes as aforesaid, to be true, and being deceived thereby, was induced by reason thereof to then and there pay, deliver and transfer to the said Thomas P. Keyes, two certificates of deposit dated June 21, 1904, issued to said William Perry by the Orion State Bank of Orion, Michigan, for the sum of five hundred dollars each, and of the value of one thousand dollars, and one promissory note made by the said William Perry, dated at St. Louis, on the 9th day of July, 1904, payable four months after date, for the sum of five hundred dollars and of the value of five hundred dollars, as and for part of the purchase price of said twenty shares of stock of the said St. Louis Cement Brick Manufacturing Company, and the said William Perry then and there did pay, deliver and transfer the said two certificates of deposit of five hundred dollars each, and said note for five hundred dollars to him, the said Thomas P. Keyes, as and for part of the purchase price of said twenty shares of stock; and the said Thomas P. Keyes then and there feloniously, willfully, designedly, knowingly and fraudulently, in the manner aforesaid, and by means of the fraudulent representa-

tions aforesaid, did obtain of and from the said William Perry the said two certificates of deposit for five hundred dollars made by said Orion State Bank, of the value of one thousand dollars, and the said promissory note of the value of five hundred dollars, all of the property of the said William Perry, with the intent him, the said William Perry, then and there to cheat and defraud of the same.

"Whereas, in truth and in fact, the said corporation, the St. Louis Cement Brick Manufacturing Company, did not then and there have a capital stock of fifty thousand dollars fully paid up, and was not then and there in good and solvent condition and circumstances and doing a good business; and whereas, in truth and in fact, the said corporation did not then and there have a brick manufacturing plant at which said corporation was then and there manufacturing fifty thousand brick per day by steam power; and whereas, in truth and in fact, the said twenty shares of stock, owned by the said Thomas P. Keyes, of the stock of the said St. Louis Cement Brick Manufacturing Company, were not then and there of the value of two thousand dollars, as he, the said Thomas P. Keyes, then and there well knew; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."

The facts as developed at the trial were substantially the following: That William Perry, a farmer from Michigan, went to St. Louis on the 24th day of June, 1904, and having some money to invest, on July 5, 1904, bought an interest in a real estate firm at 801 Chestnut street. The defendant was not connected with such real estate firm, but he had an office in the same room, and in this way Perry got acquainted with him. Perry first had a conversation with the defendant on July 9th about the St. Louis Brick Manufacturing Company, a corporation in which the defendant was interested, and the defendant wanted Perry to buy an inter-

est in the brick company which the defendant said was located in St. Louis, Missouri. The defendant had a lot of sample brick in the office, which he claimed were made at the brick factory, and the defendant told Perry that the company was operating a factory by steam power and making fifty thousand brick per day; that the company had a paid up capital of $50,000; that the defendant was the overseer of the factory, and he offered to sell Perry twenty shares of the capital stock for $2,000. He told Perry the stock would pay 15 per cent on the money invested, and that the company was a good paying company and that stock was worth 100 cents on the dollar. Relying upon these statements, the prosecuting witness Perry entered into a contract with the defendant for $2,000 worth of stock, which was to be turned over to Perry as soon as the money was paid. Perry did not go out to look at the factory before he contracted for the stock, but on July 9, and before contracting for it, he said to the defendant: "Let's go out and look at the factory," and the defendant said, "They have broken down and won't be running until Monday, right there lies the iron off the engine," and the defendant pointed to a piece of iron lying there in the office. On July 9, 1904, Perry gave the defendant $1,000 in checks on the Orion Michigan State Bank, and saw the cashier at a St. Louis bank cash these checks and pay the money to defendant. Perry also gave the defendant $500 in real estate, and also a note for $500 payable in four months, which note was paid in full, $250 on the 2nd day of August, and $250 on the 4th day of August, 1904. On the 21st day of July the defendant gave Perry the stock in the brick company. Afterwards Perry learned that there was no brick factory manufacturing fifty thousand brick a day, and the defendant told Perry that he did not have any steam brick plant. There was a little machine over at 1120 Chestnut street, operated by hand power, not steam power, with a capacity of five or six hundred brick per day.

After the prosecuting witness found that there was no steam factory, the defendant told him that they were going to build a factory as soon as they could get a railroad switch track in at Manchester and Theresa avenues, where the company had a lease on a piece of land. Perry went out there one day with the defendant and there were no buildings on the land.

On July 9th, and before putting any money in the concern, Perry went to Bradstreet's to find out the standing of the corporation. Bradstreet said they did not think he had any brick factory at all. Perry went back and told the defendant what Bradstreet had said and the defendant again stated that he had a steam power factory, and said: "Right there lies the iron from off the engine now."

The secretary of this corporation testified that on the 9th day of July, 1904, the company was in debt considerably, about $1,150, and at that time the company had no plant in St. Louis manufacturing brick at the rate of fifty thousand per day by steam power; that the defendant, on July 7, 1904, had told the witness that the company was in debt; that there was only a small hand press at 1120 Chestnut street with a capacity of about five hundred sample brick per day. Witness stated that on the 9th day of July, 1904, the stock of the concern had no market value. The company was in-corporated under the Missouri laws for $50,000, but a patent which the defendant owned, containing a formula for the manufacture of the cement brick, was put in for $48,900 and $1,000 in cash was paid by A. J. Maurer, and the other $100 was not shown. The witness stated that the patent had no value whatever.

Witness Bergfeld testified that in May, 1904, he paid the defendant Keyes $500 for worthless stock in the same corporation upon representations somewhat similar to the ones made to the witness Perry.

Upon the close of the State's case, the defendant asked for an instruction in the nature of a demurrer

to the testimony, directing the jury under the law to find the defendant not guilty. This instruction the court refused to give.

The defense, by way of showing the solvency of the corporation, offered evidence showing that the defendant, on behalf of the St. Louis Cement Brick Manufacturing Company, had opened negotiations with the Terminal railroad for the location of a switch track near the Collier shot tower, which property the company was figuring on leasing. These negotiations fell through because the switch was not put in. Afterwards, and on April 19, 1904, the property at Manchester and Theresa avenues was leased for ten years to the St. Louis Cement Brick Manufacturing Company, the negotiations for such lease being carried on by William Korchoff, the president of the company, and the defendant, Keyes, an officer of that company. This lease, however, was in operation but a few months on account of the failure of the corporation to pay the monthly rent provided for therein.

Witness Robert M. Noonan, a real estate agent, who represented the owner of the property leased, testified that this lease was worth $15,000 in July, 1904, and although the entire ten years rental of the leased property was less than $15,000, witness thought that the lease was worth $15,000 if the land was handled and improved properly. Witness said that he did not think the vacant ground was worth anything, unless the lessee had some plans for the future to improve it, but if it was properly improved, it would be worth $15,000.

James T. Smith, a contractor and builder, testified that he had used seven or eight thousand of the brick manufactured by the St. Louis Cement Brick Manufacturing Company in constructing buildings in St. Louis, and that he bought them from the defendant Keyes, paying $15 per thousand for them; that the brick used were good brick, standing the highest test, which was made by a Washington University engineer.

Witness stated that defendant did not have any steam factory, but only a hand machine; he supposed that the brick he used came from the defendant's factory, although he did not see the brick taken from the company's place at 11th and Chestnut streets, but the brick he used were brick similar to those he saw manufactured there on the hand machine.

James L. Hopkins, a patent attorney, testified that he performed the work of incorporating the St. Louis Cement Brick Manufacturing Company, the defendant being one of the incorporators. Defendant had good title to the patent for making the brick, which was assigned to the corporation. The corporation was organized with a fully paid up capital stock on the strength of this patent. Witness thought that a conservative value of the patent, subject, of course, to the proper commercial handling of the institution that was operating it, would be not less than $100,000, although the patent had only four years more to run. On cross-examination the witness stated that he did not know whether this patented formula had been improved or not since it had been issued, but did not know that there were many other patents in this art.

At the close of all the evidence the court instructed the jury as follows:

"Gentlemen of the Jury:

"By the information herein, which was filed in this court on the 15th day of March, 1905, the defendant, Thomas P. Keyes, is charged with the offense of obtaining money by false representations and pretenses. He pleads not guilty, and upon the question of his guilt or innocence the court instructs you as follows:

"1. If you believe and find from the evidence, under these instructions, that at the city of St. Louis and the State of Missouri, on or about the 9th day of July, 1904, or at any time within three years next before the filing of the information herein, the defendant, Thomas P. Keyes, with intent to cheat and defraud one Wil-

liam Perry, knowingly, designedly and falsely, did state, pretend and represent to the said William Perry that a certain corporation known and named the St. Louis Cement Brick Manufacturing Company, and incorporated and existing under the laws of the State of Missouri, then and there had a capital stock of $50,000 fully paid up; that said corporation was then and there in good and solvent condition and circumstances and doing a good business; that said corporation, the St. Louis Cement Brick Manufacturing Company, had a brick manufacturing plant, at which plant said corporation was then and there manufacturing fifty thousand brick per day by steam power; that the said Thomas P. Keyes was then and there the owner of twenty shares of the capital stock of said corporation, and that the said twenty shares of stock were then and there of the value of two thousand dollars, or either one or all of said representations; and if you further find from the evidence that such false statements, pretenses and representations, or either of them, so made by the defendant aforesaid, were relied on and believed to be true by the said William Perry and he was deceived thereby, and then and there and thereby unlawfully and fraudulently induced to pay, deliver and transfer to the said Thomas P. Keyes two certificates of deposit, dated June 21, 1904, issued to the said William Perry by the Orion State Bank of Orion, Michigan, for the sum of $500 each, and of the value of $1,000, and one certain promissory note made by the said William Perry, dated at St. Louis on the 9th of July, 1904, payable four months after date, for the sum of $500, and of the value of $500, as and for part purchase price of said shares of stock of the said St. Louis Cement Brick Manufacturing Company, and that the said money so paid over and delivered to the defendant was of the value of $30 or more, and was the money and property of the said William Perry; and you further find from the evidence

that the defendant, by means of said false statements, pretenses and representations so made as aforesaid, or any one of them, and with the unlawful and fraudulent intent to cheat and defraud the said William Perry, and for that purpose did then and there obtain said money and note, or any part thereof, of the value of $30 or more; and you further find from the evidence that said statements, pretenses and representations, or any one of them, were untrue, and so known by the defendant at the time to be untrue and false, and that the said St. Louis Cement Brick Manufacturing Company then and there did not have a capital stock of $50,000 fully paid up, and that said corporation was not then and there in good and solvent condition and circumstances and doing a good business, and that said corporation, the St. Louis Cement Brick Manufacturing Company, did not have a brick manufacturing plant at which plant said corporation was then and there manufacturing 50,000 brick per day by steam power, or that the said Thomas P. Keyes was not then and there the owner of twenty shares of the capital stock of said corporation, or that the said twenty shares of stock were not then and there of the value of two thousand dollars, as stated in the information herein, and that defendant unlawfully and fraudulently made said false statements, pretenses and representations, or any one of them, for the purpose and with the intent unlawfully and fraudulently to cheat and defraud the said William Perry, then you should find the defendant guilty as charged in the information, and unless you so find the facts you should acquit the defendant. If you find the defendant guilty as charged, you will assess his punishment at imprisonment in the penitentiary for a term of not less than two years nor more than five years.

"2. The question of intent to cheat and defraud is one of fact for you to determine from all the evidence in the case. This intent need not be proven by direct and positive evidence, but it may be lawfully and

properly inferred by you from all the facts and circumstances in evidence having reference to and bearing upon and tending to prove such intent, provided such evidence is sufficient to satisfy you of such intent beyond a reasonable doubt.

"3. The court instructs you that the defendant is on trial for obtaining money by false pretenses from William Perry, and for that offense alone, and that the testimony of transactions between defendant and other persons than William Perry was offered by the State and admitted by the court for the sole purpose of assisting you in determining the intent of the defendant and his good faith or honesty of purpose in any transaction he had with said William Perry, and you should consider it for that purpose, and that alone, and although you may believe that the defendant behaved dishonestly with such other persons, you cannot convict him in this case unless you should also further believe and find from the evidence that he obtained money or property from said William Perry in a manner such as to make him guilty as defined in instruction number one.

"4. You are further instructed that the law requires the capital stock of all business and manufacturing corporations shall be paid up in lawful money of the United States, or in property or services at their fair market value before it can be fully paid up; then if you believe and find from the evidence in this case that the capital stock of the St. Louis Cement Brick Manufacturing Company was fully paid up either in money or in property and services at their fair market value, or partly in each on the 9th day of July, 1904, you will find that said capital stock was fully paid up at that time.

"5. You are further instructed that the information contains the formal statement of the charge, but is not to be taken as any evidence of defendant's guilt. The law presumes the defendant to be innocent, and this presumption continues until it has been overcome

by evidence which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests with the State. If, however, this presumption has been overcome by the evidence and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict. If, upon consideration of all the evidence, you have a reasonable doubt of the defendant's guilt, you should acquit; but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching the defendant's guilt, and not a mere possibility of his innocence.

"You are further instructed that you are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. In determining such credibility and weight, you will take into consideration the character of the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the defendant or the prosecuting witness William Perry, and the probability or improbability of his or her statements, as well as all the facts and circumstances given in evidence. In this connection you are further instructed that if you believe that any witness has knowingly sworn falsely to any material fact, you are' at liberty to reject all or any portion of such witness's testimony.

"6. The argument of counsel is for the purpose of aiding you to reach a proper verdict in the cause by refreshing in your mind the evidence which has been given to you in this cause and by showing the application of the law thereto; but whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberations by the evidence as you understand it and remember it to be true, and by the law as given by the court in these instructions, and render such verdict as in your conscience and reason and candid judgment seems to be just and proper."

Upon the submission of the cause to the jury they returned a verdict of guilty, fixing the punishment of defendant at imprisonment in the penitentiary for a term of two years. Motions for new trial and in arrest of judgment were timely filed and by the court overruled. Judgment and sentence was rendered in accordance with the verdict and from this judgment defendant prosecuted his appeal to this court and the record is now before us for consideration.

OPINION.

The record in this cause presents three legal propositions for our consideration, which are embraced in the following assignments of error by appellant:

1st. That the facts developed upon the trial of this cause are insufficient to support the finding and verdict of the jury.

2nd. That the court erroneously declared the law to the jury.

3rd. That upon the testimony as introduced in this cause upon the trial the court failed to fully declare the law applicable to this cause.

I. The statute upon which this prosecution is predicated is section 1927, Revised Statutes 1899. It provides: ''Every person who, with intent to cheat or defraud another, shall designedly, by color of any false token or writing, or by any other false pretense, obtain the signature of any person to any written instrument, or obtain from any person any money, personal property, right in action or other valuable thing or effects whatsoever, and every person who shall, with the intent to cheat and defraud another, agree or contract with such person or his agent, clerk or servant for the purchase of any goods, wares, merchandise or other property whatsoever, to be paid for upon delivery, and shall, in pursuance of such intent to cheat and defraud, after obtaining possession of any such property, sell,

transfer, secrete or dispose of the same before paying or satisfying his agent, clerk or servant therefor, shall, upon conviction thereof, be punished in the same manner and to the same extent as for feloniously stealing the money, property or thing so obtained.''

The first contention of the appellant, that the facts elicited at the trial of this cause are insufficient to support the verdict of the jury, is predicated upon the theory that the prosecuting witness could have readily investigated the truth or falsity of the representations charged in the information, and failing so to do it is insisted that under the law of this State such representations and pretenses as shown in the testimony do not fall within the provisions of the statute as herein indicated.

We have carefully read in detail the testimony of all the witnesses testifying in this cause upon the trial as disclosed by the record before us, and we are unwilling to give our assent to the contention of appellant that the facts developed upon the trial are insufficient to support the finding and verdict of the jury. We are aware of the extent to which some of the courts have gone in announcing the rule that it is no part of the duty of the court to interpose and undertake to protect the unduly credulous, who are willing to listen and give credence to the bold, naked statements or assertions of parties seeking to acquire money or property; undertaking to carry out the purposes of the statute defining and creating this offense, we are unwilling to take such an extreme view as is indicated by some of the cases cited by appellant. The enactment of the statute upon which this prosecution is predicated is a clear announcement to the public that this Commonwealth will not tolerate the obtaining of money by one person from another by any sort of fraudulent methods. If the rule is to be announced that money or property may be obtained from a citizen of this State by another by means of

false and fraudulent representations, and with the design to cheat and defraud, and that, unless the party to whom such false and fraudulent representations are made makes an investigation which at least must require more or less time, trouble and expense, such party making such false and fraudulent representations does not fall within the provisions of the statute and is not guilty of the offense therein defined, we confess that such rule would very nearly approach the abolishment of the true purpose and spirit of the provisions of that statute.    There would certainly be very few cases where false and fraudulent representations were made but what their truth or falsity, by the expenditure of a little time and money, could be ascertained.    Such is not the spirit or purpose of the statute creating the offense upon which this prosecution is based.    The effect of the law now under consideration is to require fair dealing between the citizens of this State, and to prohibit fraudulent and unfair methods in the transaction of business, and the courts are not authorized, under the provisions of this statute, to say to the citizen, "You may by false and fraudulent representations obtain the money and property of another, yet unless such person is sufficiently vigilant to make an investigation as to the truth or falsity of the representations, then you are not guilty of any offense within the terms of the provisions of the statute."    We do not mean to say that it is every false and fraudulent representation by which money and property of one person is obtained by another that constitutes the offense denounced by section 1927, for if the representations are absurd or irrational, or such as are not calculated to deceive the party to whom they are made, or when the pretenses and representations are such that the party to whom they were made had the means at hand at the time to detect their falsity, then, and in that case, there would be no criminal offense under the true spirit and purpose of the statute.    But on the other

hand, if false and fraudulent representations are made which are neither absurd nor irrational, and are such as are calculated to deceive the person to whom they are made, the failure of the party to whom such false and and fraudulent representations are made to ascertain their truth or falsity by making an investigation of the character of the business to which the representations referred, would by no means place the party making them beyond the purview of the provisions of the statute and not amenable to the penalties therein imposed.

The purpose of this statute was very clearly indicated in State v. Willard, 109 Mo. l. c. 247. GANTT, J., speaking for this court, said: ''It is very clear that the statute was enacted to punish those, and those only, who obtain or attempt to obtain from any other person, his money, property or valuable thing, by means of or by use of some one of the fraudulent devices enumerated in the act itself. The two essentials of the offense are, first, the obtaining or attempting to obtain the goods, or other valuable thing, and, second, accomplishing it, by some of the means denounced in the statute.''

The design and purpose of statutes denouncing offenses like the one in the case at bar, in our opinion, is nowhere more clearly or correctly stated than in Watson v. People, 87 N. Y. l. c. 566 and 567. In discussing a statute similar to the one upon which this prosecution is based, the New York court expressed its views in the following language: ''The statute is designed to furnish protection to those who from undue confidence in others, or inexperience, are liable to become the victims of dishonest and designing dealers. . . . When all the circumstances evince that the representation was made designedly with an intent to cheat, or was calculated to deceive and capable of defrauding, the prisoner cannot excuse himself by saying that if you had been sharp, vigilant and astute, you could have detected the fraud. When there is an absolute representation, false and untrue, and known to be

such, the purchaser of property has the right to rely upon it. . . . . And common honesty and morality demand that the fraudulent dealers should not screen themselves by the excuse that the party could have detected the fraud if he had not relied upon the representations made.''

This court, in State v. Hubbard, 170 Mo. 346, indicates very clearly its inclination to follow the ruling of the New York court upon statutes treating of offenses of the character of the one at bar. In that case, quoting approvingly from 47 N. Y. 307, it is said: ''Thus the false representations that defendant had money on deposit in bank and his check would be paid on presentation, was held sufficient. [Smith v. People, 47 N. Y. 303.] And it was further held that the court properly refused to charge the jury that the pretense must appear in the indictment to be such as could not be guarded against by an exercise of common sagacity and prudence.'' It further appears in the Hubbard case that this court is not favorably impressed with the theory that a person who obtains money or property by false or fraudulent representations may escape the penalties imposed by the provisions of the statute by showing that the party to whom the representations were made was unduly credulous and failed to make an investigation, or that the representations were not sufficiently specific. Burgess, J., in speaking for this court, said: ''Neither can defendant complain that the indictment does not more particularly describe the steer cattle, since it is his own description, nor does it lie in his mouth to find fault with the bank's officers because they did not require and exact of him a more specific false pretense but trusted him and loaned him the money on the false representations which he saw fit to make. He cannot be allowed to say, 'You trusted me on this representation, and because it was not specific I had a right to swindle you.' ''

So it may be appropriately said in the case at bar,

that the defendant cannot be allowed to say, "You believed and relied upon my representations in relation to the character and nature of the business in which I sold you stock, and I obtained your money by reason of such representations, but you having failed to be vigilant and make an investigation into my business affairs, and ascertain the truth or falsity of my representations, I had a right to swindle you, and I am not amenable to the provisions of the statute."

The case of State v. Williams, 12 Mo. App. 415, is another indication of the views of the appellate courts of this State upon the propositions now under discussion, and that such views are not in accord with those of some of the decisions in other states cited by counsel for appellant. In that case defendant requested an instruction which embraced the declaration of law that, before the defendant could be convicted, it must appear from the evidence that such trick, deception and false representation, as charged in the indictment, were of a character against which a man of ordinary caution and intelligence could not have guarded himself. The trial court refused to approve of this part of the instruction requested and the same was stricken out and the remainder of the instruction was given. The Court of Appeals, in speaking of the action of the trial court in its refusal to approve that part of the instruction, said: "That was right. The part stricken out was not the law. The law was intended for the protection of persons who are not possessed of ordinary caution and intelligence; for these are the persons who are generally victimized by such tricks as the one which the defendant is shown to have resorted to in this case."

While the rule as contended for by learned counsel for appellant finds some support in decisions of other states, yet after a careful review of all the authorities the contention is opposed by the overwhelming weight of authorities in this country. The law is nowhere more

clearly or correctly stated upon this subject than in the case of Woodbury v. State, 69 Ala. 242. In discussing the subject of false pretense, the Supreme Court of Alabama said: "A false pretense, to be indictable, must be calculated to deceive and defraud. As of an actionable misrepresentation, it must be of a material fact, on which the party to whom it is made has the right to rely; not the mere expression of an opinion, and not of facts open to his present observation, and in reference to which, if he observed, he could obtain correct knowledge. Whether the prosecutor could have avoided imposition from the false pretense, if he had exercised ordinary prudence and discretion to detect its falsity, is not a material inquiry. As a general rule, if the pretense is not of itself absurd or irrational, or if he had not, at the very time it was made and acted on, the means at hand of detecting its falsehood, if he was really imposed on, his want of prudence is not a defense. [2 Whart. Cr. Law, sec. 2128.]"

In Thomas v. People, 113 Ill. 531, it was very appropriately said by the court in that case: "We think it does not lie in the mouths of these defendants to say, that because, by their artifice, they inspired an unmerited confidence, they are guiltless. The offense is the combination to obtain property by false pretenses; and the very object might be, and often is, to so influence the party as to prevent the accuracy of the pretenses being tested. Whether one owns property, is a fact. The truth in regard to it might, undoubtedly, be disclosed by the record, but it might equally be disclosed by the declarations of the party; and the most dangerous artifice, and that against which it is most important the law should protect simple-minded and credulous people, is that whereby they are induced to forego all investigation, and trust implicitly to the trickster." [2 Wharton on Crim. Law (7 Ed.), sec. 2128; Cowen v. People, 14 Ill. 348; State v. Munday, 78 N. C. 460; State v. Dorr, 33 Maine 498.]

The Supreme Court of Iowa, in State v. Montgomery, 56 Iowa l. c. 199, in discussing the correctness of an instruction given on the part of the State, said: "We can conceive that alleged false pretenses might be so frivolous as to preclude the supposition that any person could be misled by them and induced thereby to part with his money. But this is certainly not such a case. The court was fully justified in submitting the question as to whether the defendant obtained Frizzell's money by the false representations. It is true that these representations were not such as would probably have induced a shrewd and experienced man to part with his money. The criminal classes, it may be presumed, do not usually approach such men with such methods. But they were well calculated, we think, to mislead and defraud some men. At all events, it was a fair question for the jury as to whether they believed that Frizzell was defrauded by them, and this question was fairly submitted. If Frizzell was defrauded by the false pretenses, they are not to be regarded as frivolous as to him. We see no error in the instruction." This case was followed and re-affirmed by the same court in State v. Davis, in the same volume at page 202.

In Commonwealth v. Lee, 149 Mass. l. c. 184, the Supreme Court of that State, in discussing one of the instructions in the cause, thus expressed its views upon the law as embraced in an instruction. It said: "The instruction, that the indictment could not be sustained if James, the seller, had the means of knowing that the property was not that of the defendant, should not have been given. He was entitled to rely on the statements of the defendant, and was not further put upon his inquiry as to a motive which was within the knowledge of the defendant, and as to which he himself knew nothing."

In State v. Hill, 72 Maine 238, the defendant was indicted, tried and convicted of fraudulently obtaining possession of a horse by purchase on credit, by false

pretenses that he was the owner of valuable and unincumbered real estate. By the facts developed upon the trial of the case it was shown that the real estate was incumbered by a mortgage, and the defendant's counsel requested the court to instruct the jury that if the mortgages were recorded it was notice to Mr. Best to negative a charge that he was deceived by any representations, if made, that the real estate was free from incumbrance. The court in discussing such request said that it was properly refused and expressly ruled that the doctrine of constructive notice does not apply to such cases.

In re Greenough, was a habeas corpus proceeding decided by the Supreme Court of Vermont (31 Vt. 279). The petitioner, Greenough, in that proceeding, had been indicted in the State of Illinois under a statute denouncing the offense of obtaining money under false pretenses. He fled to the State of Vermont and the Illinois authorities were seeking to enforce their proceeding against him and secure his arrest in the State of Vermont, whereupon the petitioner made application for a writ of habeas corpus in the State of Vermont. It was insisted by counsel for the petitioner that there was no offense charged under the statute of Illinois, and the Supreme Court of Vermont, in discussing that question, said: "The pretense, as charged, is the false and fraudulent representation that a certain recipe in writing, combining certain articles, would produce, as a compound, a non-explosive burning-fluid and camphene, of great value. The bill negates *in toto* the truth of the representation, and charges upon Greenough a *scienter* of its falsity, and fraud also, and that the vendee purchased the recipe for the sum paid by him as alleged in the bill, relying upon the representations of Greenough. If the means used by Greenough constitute a false pretense, I do not understand it is claimed that this is not a case within the Illinois statute. I am not aware what the decisions of the Illinois courts have

been on this statute, but I presume they have been, and will be, in unison with those of other courts upon similar statutes. The statute of Illinois is equally broad with the English statute of George IV, and the statutes of other states, and it was designed to protect the weaker part of mankind, and it has been held to be law at the present day, that it is none the less a false pretense, although the party imposed upon might by common prudence have avoided the imposition. If he was in fact imposed upon, it is no good reason for the offender to allege, that by use of due diligence or ordinary care the imposition might have been prevented. [See 2 East Pleas of Crown, 828; Reg. v. Wickham, 10 Adol. & E. 34; Reg. v. Woolley, 1 Den. C. C. 559; Commonwealth v. Henry, 10 Harris 256.]''

Many other states have expressed similar views to those herein indicated, but we deem it unnecessary to further burden this opinion with the citation of additional authorities. It is apparent from the insistence of counsel for appellant that the case of State v. Cameron, 117 Mo. 641, is chiefly relied upon to support the contention so earnestly and ably presented in this cause. An analysis of the decision in the Cameron case clearly demonstrates that it is not in conflict with the conclusions indicated as applicable to the case at bar, nor in conflict with the rules announced by the courts of other states to which we have called attention. The facts before the court in that case manifestly distinguish it from the case at bar. GANTT, J., speaking for this court, decided the Cameron case, and with what was said in that case we find no fault, and do not mean, by the rules announced as applicable to the case now in hand, to retract any of the rules of law as therein announced. It is well not to overlook what in fact was decided by Judge GANTT in the Cameron case respecting the subject now under discussion. He said, during the course of the opinion, that ''the contract is nowhere set out, but it is alleged it was in writing. There is no aver-

ment that Richards could not, or did not, read the contract, nor is there any averment of any fraudulent trick or device by which he was prevented from reading the contract before he signed it. It is not pretended that defendant failed to do the work. On the contrary, Richards says when it was finished, defendant produced the contract, estimated the work, and found it came to $195, and he paid him the cash therefor without protest. It is charged that the promise of defendant was that the extra work over the one hundred feet should not exceed $5, and yet when the written contract was presented to Richards to sign, by which he was obligated to pay $195 for the work, no reason is given for his signing it. It is not averred that he was so ignorant he could not read the writing, or that he was blind, or that he was shown one paper, and, by a trick, induced to sign another. The slightest attention on his part to the ordinary methods of transacting business, especially between strangers, would have enabled him at once to discover the contract called for more than he had agreed to pay, and he could have declined to sign it; but more than this, when called on to pay, if the contract had been fraudulently procured, he could have retained his money in his pocket, but with a full knowledge that the defendant claimed the contract called for $195, and with no concealment on defendant's part of this claim, he paid that amount. It is not the policy of the law to punish as a crime the making of every foolish or ill-considered agreement. If it is, the jails and prisons must be greatly enlarged. 'Where the pretense is absurd, or irrational, or such as the party injured had, at the very time, the means of detecting at hand, it is not within the act.' [Com. v. Hutchinson, 2 Par. (Pa.) Sel. Equity Cas. side p. 309.]''

That is not this case, as is clearly indicated by the testimony heretofore recited. We have in this case the defendant, who apparently was a business man, operating a business in the city of St. Louis. He had an office

in the same building with the prosecuting witness; had a lot of sample brick in the office which he claimed were made at the brick factory, and then proceeded to negotiate a sale of so many shares of stock in the brick company, and made representations as to the nature and character of the business heretofore indicated, the solvency of the concern and the amount of profits to be realized therefrom. Now, while it may be said that careful and prudent business principles would have required a more diligent effort to ascertain the truth or falsity of the representations than was made by the prosecuting witness, yet it is manifest that such representations were not absurd or irrational, but on the contrary were just such representations as are frequently relied upon by reasonably intelligent business men who are deceived thereby, and we are unwilling to say that, if the representations such as the testimony indicates were made in this case were false and fraudulent, and made by the defendant with the intent and design of defrauding the prosecuting witness, and in fact did defraud him, simply because he was not as vigilant as he should have been, and did not exercise that extreme care and prudence that the shrewd business man would have exercised under similar circumstances, such wrongful acts are not such as fall within the provisions of section 1927.

II. This brings us to the consideration of the complaint by appellant that the court erroneously declared the law to the jury. There are three grounds upon which the appellant predicates his challenge to the correctness of the instructions given by the court:

1st. That the court did not properly define the offense of obtaining money or property by false pretenses.

2d. That the court failed to instruct the jury that a duty rested upon the prosecuting witness to investigate the alleged representations claimed to have been made by the defendant.

3d. That the court erroneously instructed the jury that if either one or all of the alleged representations made by the defendant were relied upon and believed to be true by the prosecuting witness and he was deceived thereby and parted with his money, checks and drafts mentioned, then the defendant should be convicted.

Instruction 1 given by the court in this case required the jury to find every essential fact necessary to constitute the offense with which the defendant was charged, and there was no necessity for any further definition of the crime of obtaining money or property under false pretenses. The terms of the statute defining this offense and used in charging it in the information are not technical terms, and, as was said in State v. McChesney, 16 Mo. App. 1. c. 269, "We are not aware of any rule which makes it necessary to define more fully for the comprehension of the jury, the nature of the offense or of the means by which it may be perpetrated. The terms 'false pretense' and 'false representation' have no technical meaning different from that of their common daily acceptation, wherever they are used by persons who speak our language. No instruction from the court could present their meaning any more clearly than it must be perceived by men of sufficient intelligence to occupy a jury-box, in the import of the words themselves."

There is no merit in this insistence, and that point must be ruled adversely to the appellant.

The next insistence of the appellant in respect to errors complained of in the instructions is that the court should have instructed the jury that there was a duty resting upon the prosecuting witness to make an investigation of the truth or falsity of the representations made, and that his failure to make such investigation entitled the defendant to an acquittal.

Upon this proposition it is sufficient to say that,

while it was clearly the duty of the court to submit to the jury the question as to whether the representations complained of in the information were in fact made, we think it is clear that it was no part of the duty of the court to submit to the jury the question as to whether or not the prosecuting witness made an investigation to ascertain the truth or falsity of the representations made, and to have so instructed the jury would have been manifestly an erroneous conception of the law upon that subject.

In causes for obtaining money by false and fraudulent representations, when the testimony is all in, then it is purely a question of law with the courts as to whether or not the representations indicated by the testimony in the cause fall within the provisions of the statute denouncing the offense, and if they do then it is the duty of the court to require the jury to find as a question of fact whether such representations were in fact made with the intent, etc., required by the law. At the close of the testimony the court must determine as a legal proposition as to whether or not the testimony is sufficient to submit the cause to the jury, and it is not a question to be submitted to the jury as to whether or not the representations were absurd, irrational, or whether or not there should have been an investigation of the truth or falsity of the representations charged to have been made. That is a matter that must be determined by the court; otherwise, it would simply amount to submitting a legal proposition to the jury as to whether or not the respresentations made, as indicated by the testimony, constituted a criminal offense under the provisions of the statute, and it certainly will not be seriously contended that that question could be submitted to the jury. In other words, it is the province of the jury to determine whether or not the representations as charged were made, but whether or not representations under all the surrounding circumstances constitute an offense, the manner in which they

are made, the means that the party to whom the representations were made had at hand at the very time of detecting their truth or falsity, are legal questions and must be determined by the court. There was no error in the failure of the court to embrace in its instructions and require the jury to find the facts as contended for by the appellant.

It is next insisted that the court's instructions to the jury which permitted a conviction upon either one or all of the alleged representations made by the defendant, were erroneous and improperly declared the law. It is sufficient to say of this complaint that the correctness of the instruction finds support both by the, text-writers and the decisions of this court. This instruction is in perfect harmony with the law as declared in State v. Vorback, 66 Mo. l. c. 172. The rule was thus announced in that case: "In an indictment for obtaining goods or money under false pretenses, when several such pretenses are alleged, the proof of any one will sustain the indictment." Mr. Bishop in his' recognized standard work upon Criminal Law (6 Ed.), volume 2, section 418, very clearly stated the rule. He says: "There need be only one false pretense, and though several such pretenses are set out in an indictment, yet if anyone of them is proved, being such as truly amounts in law to a false pretense, the indictment is sustained."

We have carefully considered all of the instructions given by the court in this cause. They fully cover every phase of this cause to which the testimony was applicable. The testimony as detailed by the witnesses was ample to support the finding and verdict of the jury.

We have given expression to our views upon the legal propositions disclosed by the record in this cause, and finding no reversible error the judgment of the trial court should be affirmed, and it is so ordered.

All concur.