STATE v. SAMUEL J. MANDELL, Appellant.—No. 38702.—183 S. W. (2d) 59.

Court en Banc, October 9, 1944.

Rehearing Denied, November 6, 1944.

*Dubinsky & Duggan* for appellant.

506

*Roy McKittrick*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

WESTHUES, C.—This prosecution was commenced on September 6, 1940, by an indictment filed in the circuit court of the City of St. Louis, Missouri. The defendant filed a motion to quash, which the trial court sustained. The prosecuting attorney then filed an information in lieu of the indictment which procedure is authorized by section 3953, Mo. Rev. St. Ann., Rev. St. Mo. (1939). The defendant filed a motion to quash the substitute information and while that motion was pending the prosecuting attorney, with leave of court, filed an amended substitute information. Defendant then filed a motion to quash this latter information which was overruled by the court and a trial followed. The charge against defendant was the obtaining of money by false pretenses, and upon conviction he was sentenced to serve five years in the penitentiary from which sentence he duly appealed.

Appellant asserts that section 3953, supra, does not permit a prosecuting attorney to file an amended substitute information. It

is argued that since the motion to quash the substitute information was not ruled upon, the prosecuting attorney could not file an amended information. To this we cannot agree. Before the enactment of section 3953, when an indictment was quashed the prosecutor had no authority to file an information in lieu thereof. It has always been the rule that an information cannot be filed by a prosecutor unless there is probable cause for the prosecution. An indictment by a grand jury has always been considered evidence of probable cause and so has the action of a justice of the peace when he binds a defendant over to the circuit court at a preliminary hearing. The purpose of section 3953, supra, is to authorize the filing of an information in cases where the trial court ▮ finds the indictment insufficient. When an indictment has so been held insufficient, the prosecutor, by virtue of the statute, has the same authority to file an information as he has in cases where a defendant has been bound over to the circuit court by a justice of the peace. A prosecutor, pursuant to sec's. 3898 and 3953, Mo. Rev. St. Ann., Rev. St. Mo. (1939), may with leave of court amend an information either in form or substance at any time before a jury is sworn to try the case. This applies to informations filed in lieu of indictments as well as to informations filed after a defendant has had a preliminary hearing. The substitute information must of course charge the same crime as attempted to be charged in the original indictment or information. Appellant relies strongly upon the case of State v. Wright, 339 Mo. 41, 95 S. W. (2d) 1159, and also the case of State v. Barr, 326 Mo. 1095, 34 S. W. (2d) 477, as authority for his contention. We have examined these cases and fail to find wherein they have any bearing on the point now before us. We must decide the question against appellant.

▮ Appellant next urges that the amended substitute information changed the charge against the defendant and also that in one count it charged the defendant with separate and distinct offenses which were not related to each other. If the information is vulnerable to either charge leveled against it then it must be held bad. We do not find it so. The gist of the charge in the indictment was that the defendant obtained from one Maria Springer $9700 by false and fraudulent pretenses. The fraud charged was that the defendant represented to Mrs. Springer that he had lots for sale in Fair Oaks subdivision, a highly desirable residential district, and pretended to deed her lots in such subdivision when in truth and in fact such representations were false and Mrs. Springer received for her money deeds to lots not in or near Fair Oaks but lots of little value. The amended information described lots received by Mrs. Springer which were not mentioned in the indictment, but the gist of the charge was not changed. The allegations in the information as to what lots were actually conveyed were not necessary to the validity of the charge. The indictment and the information both charged that defendant

obtained $9700 on the pretense that he had for sale and was conveying lots in Fair Oaks to the prosecutrix, when in truth and in fact he had no lots for sale in such subdivision either as owner or as agent.

Neither do we agree that the information charged separate and distinct offenses. The charge was that appellant, pursuant to a continuing plan and scheme to deceive, cheat and defraud Mrs. Springer, did, between the dates of June 25, 1938, and January 12, 1939, make false representations as above outlined. The information then described in detail the fraudulent representations and the manner in which appellant obtained the $9700. The information further alleged that the representations were false, known to be false by appellant and Mrs. Springer relied upon them and parted with her money by reason of such representations. The information then concludes as follows:

"That the said SAMUEL J. MANDELL, by means and by use of said scheme and plan to deceive and cheat, and by said false representations, statements and pretenses, unlawfully, fraudulently, falsely, knowingly, designedly and feloniously did deceive, cheat and defraud the said Mrs. Maria Springer of large sums of money of the approximate value of Nine Thousand Seven Hundred Dollars ($9,700.00), lawful money of the United States, . . ."

The state chose to charge the defendant with but one offense. Whether it could have made a number of charges, each based upon a separate transaction concerning the various lots, we need not decide. Only one charge was made based upon the obtaining of the whole $9700 by one continuing fraudulent scheme. See People v. Bertsche, 265 Ill. 272, 106 N. E. 823; State v. Murray, 237 Mo. 158, 140 S. W. 899, l. c. 901 (4); 31 C. J. 770, sec's. 328, 329. The state had the right to take this procedure. The information charged but one offense and appellant's point must be overruled. Appellant in his brief cited and discussed many cases holding that an amended information cannot charge a different offense than charged in the original and that more than one offense cannot be charged in one count. This is conceded to be the law and therefore the cases cited need not be discussed or reviewed.

It will be necessary to briefly relate the evidence in order to intelligently discuss other assignments of error. The prosecutrix was a widow about fifty years of age. She was an Austrian by birth, married in Germany and came to this country, settling in Washington, Missouri, about the year 1926, where her husband engaged in business. He died in 1930, leaving some property to his widow. After the death of her husband Mrs. Springer moved to St. Louis, Missouri, where she was employed as a domestic. At one time she was employed in the home of a Dr. Vosberg who lived in Fair Oaks. It was while working there that she first met a man named Weiss who will be referred to later. In 1938, during the time the alleged fraud was

perpetrated upon her, she was employed by a dress manufacturing company on Washington avenue. During the month of June, 1938, she was introduced to the defendant by Mr. Weiss whom she had seen on various occasions, the first as above related in Fair Oaks. The introduction and what followed, as told by Mrs. Springer, was as follows:

"I came with Mr. Weiss in Mr. Mandell's office and Mr. Weiss introduced me to Mr. Mandell who said this is Mrs. Springer, Mr. Mandell. I spoke to you yesterday. And she is all alone in the country and she is not working regularly and you think to help her. And we spoke a few words, how are you, Mrs. Springer? How you like the country? And Mr. Mandell said, I would like to help you and sell you a lot. And he took out a paper and he had this idea to buy something. Excuse me, it is so hard for me. I cannot express it very well.

. . .

"And in the conversation, I sell you—See, Mr. Weiss told me, you was living in Fair Oaks. I sell you a lot in Fair Oaks. And I said to him, to Mr. Mandell, I would not like to do anything without advice of my lawyer. And he said, who is your lawyer? I said, Mr. Herbert A. Krog of Washington.

. . .

"He said, is Mr. Krog your guardian? You are not normal? Do you have to do everything with him? No, Mr. Mandell, but he will handle my affairs until now. I would like to have his advice in this case, and at the end of the conversation he made me sign a paper.

. . .

"Mr. Mandell told me to write the same evening, on Sunday evening, a letter to Mr. Krog and explain the situation to him; that Mr. Mandell is selling me a lot in Fair Oaks for only four months and after four months he is not interested and I am not interested. He said you are not interested and so I am not interested unless you keep the lot longer than four months. And to explain Mr. Krog the situation and he should send you the rest of the money. And I sent Mr. Krog the same evening as Mr. Mandell said and Wednesday he comes to my working place.

. . .

"Q. Did he say whether or not he had any lots in Fair Oaks? A. Said he had the lot.

. . .

"He had a fine lot in Fair Oaks. He said, you know the neighborhood. I said, Yes, Mr. Mandell, I know the neighborhood. He said, you apparently are familiar with the neighborhood. I said, yes, I know the neighborhood. He said, you know what fine residences are out there; what fine streets and houses and all fine people live out there and all. It is absolutely the finest lot and you can make a profit

on this lot after four months. Not a big profit, I know exactly you would not fall in for a big profit, that would be crooked, and you would not do a crooked thing. I said, No, Mr. Mandell, I would not. But it was Sunday, and this paper what I signed was dated on Monday, and he told me to write a letter to my lawyer and explain him the situation.

. . .

"He asked me how much money I had in the bank and I said I don't know exactly right now; that there was several things was not settled in Washington. He said, you will know how much you have in the bank. You have surely five hundred dollars in the bank; and he writes the check for five hundred dollars, and I signed that check for five hundred dollars.

"Q. What was that for? A. For the first payment on this lot.

"Q. Where was the lot? A. In Fair Oaks."

The prosecutrix wrote to her attorney, Mr. Krog, who had charge of her propety and was her attorney-in-fact. Mr. Krog did not honor the $500.00 check written by Mrs. Springer and on the following Friday Mr. Weiss took Mrs. Springer to Washington, Missouri, for the purpose of seeing Mr. Krog. Appellant in the meantime had advised prosecutrix to have all her money transferred to St. Louis. The net result of the trip to Washington was that Mrs. Springer obtained $500.00 in cash and a bank draft for $1000 from Mr. Krog. This cash and bank draft were delivered to appellant in exchange for a deed pretending ▆▆ to convey a lot in Fair Oaks. While at Washington arrangements were also made to have all of Mrs. Springer's money, something over $9000, transferred to the Tower Grove bank in the City of St. Louis. Appellant had previously advanced the prosecutrix $200.00 to open an account at that bank. Krog accounted to Mrs. Springer for all of her property and the power of attorney was mutually terminated. Krog wrote in response to Mrs. Springer's letter to him, following the first meeting of Mrs. Springer with appellant, and the pertinent portion of the letter is as follows:

"I thought you were trying to get everything arranged so that you would have none of your money tied up in view of going to Germany. I am afraid you have made a serious mistake by buying this property, and that you will learn later that these real estate men are not interested in reselling the property for you. After they have gotten your money they will not worry about a resale. If such would be the case, you would be sitting there with $1500 tied up. I am so sorry you did this without consulting me first."

After Mrs. Springer returned to St. Louis she paid appellant the $500.00 cash and the $1000 draft. Thereafter appellant or Mr. Weiss inquired daily of Mrs. Springer whether the balance of the money

had arrived. On one of these days appellant gave her a radio. When she did receive a letter Weiss took prosecutrix to appellant and the following occurred:

"A. Mr. Mandell took the letter in his hand and looked it over and said, oh, you have so much money. And I said, yes, this is a statement, and then they drove me home."

Within a short time thereafter appellant had sold more lots to Mrs. Springer pretending and representing that they were located in Fair Oaks. About July 14 or 15 she gave appellant a check for $2000, another for $2500 and a third for $200.00. The latter was to repay the $200.00 advanced prosecutrix to open her bank account in St. Louis. Later in the same month prosecutrix gave appellant a check for $3000, again for a lot in Fair Oaks, appellant informing her that this was the very best lot in Fair Oaks. On August 30, he borrowed $700.00 from Mrs. Springer and later in October delivered a deed to her to satisfy the loan, saying it was for a lot in Fair Oaks. When she inquired why this lot was so much cheaper than the others appellant informed her it was a smaller lot. The total amount thus far received from the prosecutrix was $9700. She had a balance in the bank of about $1000. At various times thereafter appellant asked prosecutrix for the deeds saying he wanted to register them or exchange them for other deeds. The prosecutrix began to ask about the lots and wanted to see them and while appellant promised to take her to Fair Oaks he never did. At one time when she spoke of being worried he took her to the bank where the deeds were kept, showed them to her and assured her that she had nothing to worry about. However, she did continue to worry and in December appellant gave her $300.00 and $50.00 in cash saying that represented profits on the lots he had sold for her. Mrs. Springer, however, wanted not only the profits but the amount of money that had been received for the lots. Appellant replied that he had bought other lots for her in Fair Oaks with the principal. The evidence tends to show that prosecutrix continued to worry about her investment and due to that appellant was unable to relieve her of the balance of the money she had on deposit. It was time for appellant to say "good-bye" to the prosecutrix and look for other sheep richer in fleece to be shorn. Note Mrs. Springer's evidence:

"A. Mr. Mandell said again and again I should be absolute quiet and have no sleepless nights; my money is so safe as can be.

"Q. When is the next time you saw him? A. The next time I saw Mr. Mandell on a Sunday morning when he said good bye to me to go for a trip Monday morning, on a trip to meet Mrs. Mandell and to have a six weeks or eight weeks nice vacation to Florida.

"Q. Is that the last time you saw him? A. That is the last time I saw Mr. Mandell."

The state introduced evidence that lots in Fair Oaks were reasonably worth $2500 and upward; that the lots actually deeded to Mrs. Springer were of little value. Defendant offered no evidence.

■ Appellant urges in his brief that every lot transaction was separate and distinct and that he was entitled to a trial by jury on each separate transaction. We do not think appellant is in any position to complain. The evidence fully justifies the assertion that it was his plan and scheme to defraud the prosecutrix of all her money. This comment, we think, is all that is necessary upon this point. The facts speak ■ for themselves. This also disposes of appellant's contention that all evidence introduced by the state concerning transactions other than the first was erroneously admitted.

■ Next appellant urges that the venue for this prosecution was in St. Louis county and not in the City of St. Louis. This contention is based solely upon the theory that the checks were cashed by the defendant at a bank located in St. Louis county. The evidence clearly reveals, however, that the checks for $2000, $3000 and $700.00 were all drawn on the Tower Grove bank located in the City of St. Louis. They were delivered to appellant in the city. The checks in the ordinary course of business were not paid until canceled at the Tower Grove bank and the amount thereof charged to the account of Mrs. Springer. The Delmar bank, where the checks were deposited by appellant, was the agent of appellant and not of Mrs. Springer or of the Tower Grove bank. Appellant's cases cited in support of his contention are authority against his position. For example, in State v. Shaeffer, 89 Mo. 271, 1. c. 280, 281, 1 S. W. 293, Shaeffer was prosecuted for obtaining money by false pretenses from one Blair. The transactions, except the payment of the money, occurred in Kansas City where Shaeffer lived. Shaeffer drew a draft on Blair dated at Kansas City, Missouri, February 12, 1884, payable at sight to his own order and charged to the account of John I. Blair. The draft was drawn on the Park National Bank, New York City and signed by Shaeffer. On the authority of Blair it was honored at the New York bank. This court held that Blair parted with his money in New York where the draft was honored and that Jackson county was not the proper venue for the prosecution. Defendant also cites State v. Fluesmeier, 318 Mo. 803, 1 S. W. (2d) 133. That was an embezzlement case and this court held that although the appellant cashed checks drawn on a St. Louis bank the money was embezzled in Warren county where he deposited the checks and embezzled the money. Corpus Juris Secundum states the rule that the venue for embezzlement is in the county where the money or property charged to be embezzled is converted and not where the money may have been lawfully received. See 22 C. J. S. 283, sec. 185 (k). It will be noted that the venue question for obtaining money by false pretenses is treated separately from that of embezzlement. See 22 C. J. S. 286, sec. 185 (n). The

general rule is announced to be that the proper venue in prosecutions for obtaining money by false pretenses is in the county where the money or property is actually obtained. In the case before us Mrs. Springer parted with her money in the City of St. Louis when the checks were charged to her account. Until that occurred she had full dominion over it. A case in point is Raymond v. State, 33 S. W. (2d) (Texas) 192. It was there held in a prosecution for obtaining money under false pretenses that the venue was in Shackelford county. The check upon which the money was obtained was drawn on a bank in Shackelford county but cashed by the defendant in a bank in Tarrant county. The exact situation as that in the case before us. We rule that the venue of the crime was in the City of St. Louis. The fact that the $500.00 cash and the draft for $1000 drawn on a bank in Franklin county were delivered to appellant in St. Louis county does not defeat the prosecution for the money obtained falsely in the City of St. Louis. The trial court instructed the jury to disregard any evidence with regard to payments made to the defendant outside of the City of St. Louis.

■ Appellant further urges that Mrs. Springer was advised and warned by her lawyer, Mr. Krog, that he was suspicious of the transaction and therefore the prosecution must fail. The only fault to be found with the suspicions of Mr. Krog, as revealed in his letter, is that they were far short of what was about to happen to Mrs. Springer and her money. The letter revealed that Krog advised prosecutrix that after the real estate men had sold her the lots in Fair Oaks they would not bother about a resale and her money would be frozen in real estate. The letter of Mr. Krog made no suggestion of any suspicion that the defendant would perpetrate a fraud as revealed by the evidence. And even if it had, can appellant complain because he was so persuasive in his guile and fraud that he gained the confidence of Mrs. Springer even against the advice of her friends? There is no merit in the argument. See State v. Keyes, 93 S. W. 801, l. c. 805, 196 Mo. 136.

■ Neither is there any merit in appellant's position that the representations were not as to existing facts but only as to what appellant would do in the future. Appellant ■ represented to Mrs. Springer that he had lots in Fair Oaks for sale and was deeding her such lots. Those representations were false and were not mere promises of something to be done in the future. Appellant knew prosecutrix was acquainted with the value of property in Fair Oaks and used that to perpetrate a fraud upon her. The evidence also fully justifies the assertion that Mrs. Springer relied on those representations, and the fact that she was obtaining lots in Fair Oaks was the principal inducement which prompted her to part with her money. We need not comment on the sinister manner in which the fraud was accomplished. The record speaks for itself.

■ Appellant, Mandell, says the information charged that he was doing business as Henry B. Schiller Realty Company and that the proof failed to sustain that allegation. Aside from the immateriality of that point Mandell wrote checks and contracts, signed by the prosecutrix, wherein he used the name of Henry B. Schiller Realty Company. That is a sufficient answer to appellant's contention.

■ Appellant complains because the trial court permitted the state to introduce in evidence the file mark on the indictment and the fact that the indictment had been quashed. The prosecutor probably did this out of utter caution so that the record would show that the indictment had been quashed before he filed an information. Appellant had previous to this questioned the prosecutor's right to file an information in lieu of the indictment and had gone so far as to threaten to apply to this court for a writ of prohibition. The indictment was not read to the jury. In view of the instruction that the information is a mere formal charge and must not be considered as evidence and in view of the fact that the indictment was not read to the jury nor introduced in evidence we rule no prejudicial error resulted.

■ Appellant complained of instruction number four advising the jury that the defendant was on trial on a charge of defrauding Mrs. Springer and that evidence of other transactions was not to be considered by the jury except as these transactions might shed light on the intent of appellant. This was a cautionary instruction intended for appellant's benefit. There was evidence of other transactions concerning lots in the same locality as those deeded to Mrs. Springer. Appellant's contention, therefore, that the evidence did not disclose any other transaction is erroneous. Such cautionary instructions have often been approved. 23 C. J. S. 803, sec's 1240, 1242. If the instruction had not been given appellant would probably be complaining that the jury had convicted him on the evidence of other transactions not connected with the charge in the information. The instruction in this case merely referred to other transactions and not other offenses.

■ Instruction number five was alleged to be erroneous because it assumed that appellant made false representations in that it informed the jury that in determining the question of whether the representations did in fact deceive the prosecutrix it should consider the character of the representations and the capacity of Mrs. Springer and not what would deceive a man of acumen and ordinary ability. We do not see how this instruction would have mislead the jury. Instructions must be read together and in this case the court gave a number of pointed instructions which certainly protected the defendant against any assumption that he made false pretenses. By instruction ten the jury was informed that unless the defendant represented to prosecutrix that he owned or that he was an agent of an

516

owner of lots in Fair Oaks it should acquit him. Instruction five complained of correctly declared the law. In State v. Keyes, supra, 196 Mo. 136, l. c. 155, 93 S. W. 801, this court approved the following:

" 'Whether one owns property, is a fact. The truth in regard to it might, undoubtedly, be disclosed by the record, but it might equally be disclosed by the declarations of the party; and the most dangerous artifice, and that against which it is most important the law should protect simple-minded and credulous people, is that whereby they are induced to forego all investigation, and trust implicitly to the trickster.' "

See also State v. English, 11 S. W. (2d) 1020, l. c. 1023 (5, 7).

■ Appellant makes complaint of the refusal of instruction (b) offered by him. This instruction was clearly erroneous because it informed the jury that if Maria Springer could have by an investigation discovered that appellant's representations were false then he was not guilty. See State v. Keyes, supra, 196 Mo. 136, l. c. 155, 93 S. W. 801, [66] where this court quoted with approval the following:

"We think it does not lie in the mouths of these defendants to say, that because, by their artifice, they inspired an unmerited confidence, they are guiltless."

Finding no reversible error in the record the judgment is affirmed.

PER CURIAM:—The foregoing opinion in Division Two by WESTHUES, C., is adopted as the opinion of the Court en Banc. All concur, except Tipton, J., absent.