**STATE of Missouri, Respondent,**

v.

**Melvin RACK, Appellant.**

**No. 46678.**

Supreme Court of Missouri,

Division No. 1.

Nov. 10, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 8, 1958.

Morris A. Shenker, John E. Bardgett, Sidney M. Glazer, St. Louis, for appellant.

John M. Dalton, Atty. Gen., James E. Conway, Asst. Atty. Gen., for respondent.

WESTHUES, Judge.

The defendant Melvin Rack was convicted of manslaughter in the Circuit Court of the City of St. Louis, Missouri. It was alleged in the indictment that Rack had previously been convicted of a crime and had served a sentence from which he had been discharged. The jury assessed Rack's punishment at 10 years' imprisonment in the State Penitentiary. From the sentence imposed, he appealed to this court.

The defendant briefed eight points. The first four concern instructions. In points five, six, and seven, defendant complains of rulings of the trial court which occurred during the examination of witnesses. In the last point briefed, defendant says the trial court erred in rulings made during the arguments by the attorneys to the jury.

Before considering the points briefed, we shall make a statement of the facts shown by the evidence: Between ten and eleven o'clock on the evening of June 3, 1957, the defendant Rack, Southern Campbell, who was later killed, and others were on a parking lot located near the intersection of Taylor and St. Ferdinand Avenues, St. Louis, Missouri. Located nearby was the 9–0–5 Liquor Store and a Chinese restaurant. The parties on the parking lot were gathered in small groups drinking beer or wine. While Alphonse Britton was sitting in a car belonging to Johnny James, the defendant Rack, Charles Van Jackson, and Ernest Meyers came to the car and sat or leaned on the fender. Britton called to James and asked if the defendant, Jackson, and Meyers could sit on the car. This seems to have caused a dispute between Rack and Britton resulting in Rack's hitting Britton with a beer bottle. Britton then ran to a nearby house, the home of his mother-in-law. He remained there a few minutes and then returned to the parking lot. What happened after the episode between Britton and Rack is difficult to determine from the evidence in this case. All witnesses agreed that there was a fight between Southern Campbell and Rack; that each knocked the other down at least once. The final result of this fight was that Campbell was stabbed with a knife and died within a few minutes. He was pronounced dead on arrival at a hospital where he had been taken. The defendant, his half brother Roman Columbus Brown, and one Myrtle Whitney left in a car immediately after the fight. A patrolman driving by noticed the commotion on the lot and also noted Rack's car being driven away and he followed it. After a chase, he forced the defendant to stop his car whereupon he placed Rack under arrest. Rack was taken to a hospital and an examination disclosed no bruises or wounds on his body except a small cut on two of his fingers. Campbell's body was examined at a hospital and it was found that one stab wound had caused the left lung to collapse and a stab wound of the heart had caused death. These two wounds were the most serious but there were others, one a laceration of the scalp.

The State's evidence as to whether Rack or Campbell began the fight was conflicting. However, a jury would have been justified in finding that Rack was in a belligerent mood that evening. Immediately before the fight with Campbell, he hit Britton with a beer bottle causing Britton to flee. The evidence of the defendant and his witnesses was that Campbell rushed toward Rack with a large knife in his hand (one witness stated it was a "butcher knife"); and that Campbell struck at Rack a number of times with the knife before both were on the ground rolling over and over as they fought.

Rack testified that he had a knife which he described as follows:

"Q. Now, this knife that you had, will you tell us what kind of a knife it was and what it was? A. It was just a regular two inch knife.

"Q. Pocketknife? A. Pocketknife.

\* \* \* \* \* \*

"Q. And would you tell us what its condition was before you ever got down

to this place? A. What the knife's condition was?

"Q. Yes. A. The point of it was broke off.

"Q. How did it get broke? A. It got off—I use it on my job to take nails out of tires and rocks and different things.

\*    \*    \*    \*    \*    \*

"A. It was a brown handled knife.

"Q. Made out of brown plastic? A. Plastic knife.

\*    \*    \*    \*    \*    \*

"A. Regular sixty-nine cents knife, that's all.

"Q. What kind was it? A. Sixty-nine cents knife.

"Q. I didn't ask you the price of it; I asked you what was the handle made of, material? A. Cellophane, tin."

The jury evidently did not believe that Rack would have survived the fight with so little injury if Campbell had had a large knife and he (Rack) a small, dull, broken knife. The result, that is, the deadly stab wounds Campbell received, would indicate that Rack had the large knife. In fact, the jury may have believed the evidence of a number of witnesses who said that Campbell did not have any knife. No contention is made that the evidence was not sufficient to sustain a conviction. We have detailed the facts because they have a bearing on some of the questions presented for review.

■ In the first point briefed, defendant complains of the last paragraph of the instruction (No. 2) on the credibility of witnesses. The portion complained of reads as follows:

"In this connection, you are further instructed that if you believe that any witness has knowingly sworn falsely to any material fact in issue, you must disregard such false testimony and may reject any or all of such witness' testimony."

Defendant says the instruction should have read that such false swearing must not only be done "knowingly" but also "wilfully." We do not agree. If a witness knowingly swears falsely, it means that he knows at the time that his evidence is false, that is, he knows he is lying and does so intentionally. See 51 C.J.S. p. 463, Knowingly and cases there cited. See also 94 C.J.S. Willfully p. 636.

■ Defendant further complains because the instruction told the jury that it must disregard false testimony and that the instruction should have read that the jury *"should"* disregard such evidence. We must rule the point against the defendant. The word "should" if used in an instruction such as is now under consideration would mean shall or must. Certainly there can be no error in instructing a jury that it must reject false testimony. We so ruled in State v. Swisher, 364 Mo. 157, 260 S.W. 2d 6, loc. cit. 14(16–18).

■ Further complaint is made of this instruction because it told the jurors that they "may reject any or all of such witness' testimony." Defendant cited State v. Whipkey, 358 Mo. 563, 215 S.W.2d 492, loc. cit. 494. In the Whipkey case, the instruction read that the jury " 'should reject all or any portion of such witness' testimony.' " The difference in the two instructions is apparent. We find no error in the instruction before us. See State v. Abbott, Mo., 245 S.W.2d 876, loc. cit. 881(11).

■ Defendant, in his second point, says that instruction No. 5, authorizing a conviction of manslaughter if the jury found certain facts to be true, was defective in that it failed to advise the jury that unless all the facts set out were found to be true, the defendant should be acquitted. There is no merit in this contention. The instruction required the jury to find the facts set out beyond a reasonable doubt before authorizing a verdict of guilty. This was sufficient. If defendant wished the court to give a converse instruction, it was his duty to prepare one and request that it be given.

It is further urged that the instruction was not proper because it permitted a conviction if the jury "only found defendant (did) 'wilfully and intentionally make an assault'"; further that the instruction eliminated self defense and that the words "without malice" and "without premeditation" were not defined. We cannot agree with the defendant. The instruction reads that if the defendant "did *feloniously,* wilfully and intentionally make an assault." (Emphasis supplied.) Defendent, in his brief, omitted the word "feloniously." We further find that the instruction did not eliminate self defense. Note the following portion of the instruction: "* * * and if you further find and believe from the evidence that such killing was committed under such circumstances that it was not justifiable or excusable homicide, and not in the lawful defense of his person." Malice and premeditation were not elements of the offense of which defendant was convicted. It was not necessary to define these terms. State v. Howard, 352 Mo. 410, 177 S.W.2d 616, 617 (3–5).

In the third assignment, defendant complains of instruction No. 6, which submitted to the jury the question of the alleged former conviction of the defendant and, if so found by the jurors, they were directed to assess the maximum punishment. The complaint made is that the instruction did not require the jury to find all of the essential elements as to the former conviction. We find that the instruction required the jury to find, before assessing the maximum punishment, that defendant had been convicted of larceny in a dwelling house, had been sentenced to imprisonment, had been imprisoned, and afterwards he had been discharged upon compliance with the sentence. The instruction then advised the jury that if the defendant had not been previously convicted of a felony, or was not discharged, but if the jury found defendant guilty of the offense for which he was on trial, then, in that event, the jury could assess a punishment within the

range of the statute, that being from 10 years' imprisonment down to a fine of $100 and imprisonment in the City Workhouse for not less than 3 months. Defendant's complaint concerns the second portion of the instruction. He contends that the jury should have been advised that if the defendant had not been duly sentenced or imprisoned, then in such event, the jury could assess less than the maximum punishment. We cannot see how defendant could have been sentenced if he had not been convicted. So, if the jury found, as the instruction authorized, that defendant had not been convicted, it necessarily followed that the maximum punishment was not mandatory. We rule the instruction was not prejudicial to the defendant. See State v. Martin, Mo., 275 S.W.2d 336, loc. cit. 338(3, 4).

The self-defense instruction (No. 7) given contained a clause usually found in such instructions to the effect that "Although defendant may have really believed himself to be in danger, yet he cannot be acquitted on the ground of self defense unless it further appears from the evidence that he had reasonable cause for such belief." Defendant says this cast upon him the burden of proof that he had reasonable cause to believe he was in danger. That same argument was presented to this court in State v. Dill, Mo., 282 S.W.2d 456, loc. cit. 460(3), and was there fully considered. What was there said is applicable to this case. There is no merit to this contention.

Defendant further claims that the instruction should have embodied the theory that he and his half brother Brown may have been in danger from others on the parking lot. There was no evidence that anyone other than the two with whom defendant had trouble threatened defendant. There was no evidence that anyone threatened Brown. It was not necessary, therefore, to include in the instruction the theory that defendant had the right to defend his half brother. We rule that the instruction was not too narrow as the defendant contends.

Points 5, 6 and 7 may be considered together. There was evidence, so the record discloses, that a number of the State's witnesses were friendly to the defendant. Charles Jackson, one of these witnesses, was asked if he had not stated that he saw Campbell fall and saw defendant jump on Campbell's head. Jackson answered that he told the police that "he jumped into the air and came down, whether he jumped on the boy's head or body of him, I do not know, that is what I told them." The trial court permitted the prosecutor to cross-examine this witness to a limited extent over the objection of the defendant. Then, on further objection, the trial court commented that the cross-examination should be limited to matters wherein there was basis of surprise and where the witness had made statements contradictory to his evidence. A trial court may, within its discretion, permit cross-examination of a party's own witness where there is a basis of surprise and where the witness is evidently friendly to the other side and has made statements contrary to his testimony at the trial. A trial court may exercise its discretion in such circumstances. We find no abuse of this discretion in the ruling made in this case. State v. Hogan, 352 Mo. 379, 177 S.W.2d 465, loc. cit. 466; State v. Bell, 359 Mo. 785, 223 S.W.2d 469, loc. cit. 471(3).

A police officer, William Tipolt, was a witness for the State. On cross-examination, defendant's attorney asked the officer what statements various witnesses had made to him. The trial court sustained objections to these questions on the ground that the evidence was hearsay. Counsel for the defendant persisted in his questioning and after a number of objections were sustained, the trial court said, "Mr. Bardgett, don't you ask that question anymore; if you do, you will be in trouble. You have been skirting around the edge of hearsay for sometime. I have excluded it about three times, and don't want you to do that anymore." Defendant asked for a mistrial which request was refused. A trial court must, in the interest of justice, maintain orderly procedure in the course of a trial. If an attorney persistently disregards the rulings of a trial court, he may be admonished and, if the circumstances warrant, be reprimanded for his misconduct. State v. Barnholtz, Mo., 287 S.W.2d 808, loc. cit. 812(5); State v. Montgomery, Mo., 223 S.W.2d 463, loc. cit. 469(18, 19). We deem the action of the trial court not improper.

Defendant, in point 7, complains that the trial court did not permit the defendant, on cross-examination of State's witness Britton, to show the details of a fight the witness had had with the State's witness Charles Jackson a week before the killing of Campbell. Defendant says such evidence would shed light on who began the quarrel and also show Britton's hostility to Jackson who was friendly to the defendant Rack. This evidence was properly rejected as being too remote.

In the final point, defendant says that the prosecuting attorney in this case, during his argument to the jury, made statements tending to impeach the State's witnesses. The prosecutor did argue that a number of the witnesses had an interest in the trial. The record supported the prosecutor's argument. Defendant's half brother was friendly to defendant and the attorney for the defendant stated in his brief that witness Jackson was friendly to defendant Rack. The prosecutor's argument that the State was forced to rely upon witnesses friendly to the defendant was not improper.

When the defendant's attorney was making his argument to the jury, he stated that the prosecutor, during a recess, took witness Jackson "back in his own room and couldn't break him back there what Jackson was telling him. I don't even think that is fair, but that is what was done in the middle of the testimony." The trial court sustained the State's objection to this argument. Defendant says this ruling was erroneous. Jackson was the friendly witness who the prosecutor says surprised him in parts of his evidence. An attorney,

whether he is a prosecutor or a defender, has a right to talk to his witnesses. Certainly, there is nothing unfair about that. In fact, attorneys should in all cases talk to witnesses to determine what they know about the case. The ruling of the trial court was proper.

We have considered all of the points briefed. We are of the opinion that the defendant had a fair trial. Matters of record that we are required to review have been examined.

Finding no reversible error, we hereby affirm the judgment.

All concur.