STATE of Missouri, Respondent.

v.

Lola Lorene PERKINS, Appellant.

No. 49985.

Supreme Court of Missouri,

Division No. 2.

June 8, 1964.

Motion for Rehearing or to Transfer
to Court En Banc Denied
July 13, 1964.

**434**

Thomas F. Eagleton, Atty. Gen., Jefferson City, Theodore C. Beckett, Sp. Asst. Atty. Gen., Kansas City, for respondent.

Emanuel Williams, St. Louis, for appellant.

BARRETT, Commissioner.

Lola Lorene Perkins and her husband, the Reverend Matthew Perkins, were charged under the second section of the rather new and simplified "stealing" statute; *"It shall be unlawful for any person to intentionally steal the property of another,* either without his consent or *by means of deceit."* RSMo 1959, § 560.156, V.A.M.S. While the prosecuting witness, Robert N. Amacker, and his Hollybrook Land Company claim to have been bilked of the total sum of $267,-800.82, the information charges that Lola and her husband directly and deceitfully stole the sum of $79,661. Upon her separate trial Lola has been found guilty and sentenced to seven years' imprisonment.

■ One of the assignments in the motion for a new trial (there was also a motion to dismiss the information) is that the particular subsection of the statute, § 560.-156 (sub. 2), under which she was convicted is unconstitutional in that it is "Vague, indefinite and uncertain, fails to set forth a standard of acts, conduct or deeds which would constitute an offense and fails to define such conduct or offense or set forth under what circumstances any such acts, conduct or deeds would constitute an offense, fails to define the term Deceit and leaves the question of the commission of any offense under said section to be legislated and determined by * * * the courts." While the legislature must inform the citizen with some degree of specificity just what acts are prohibited, thus affording "an understandable rule of conduct," the definition and punishment of crime in general is a legislative function upon which the courts may not encroach. 14 Am.Jur. Criminal Law § 19, p. 773; 16 C.J.S. Constitutional Law § 151(6), p. 769. It is not necessary here to examine into the history and purpose of the statute in detail, that was done in State v. Zammar, Mo., 305 S. W.2d 441, two years after the passage of the act. The appellant singles out of context the one subdivision relating to stealing

by deceit. But as was pointed out in State v. Zammar, eight or nine states had then adopted similar statutes, the purpose of the enactment was to eliminate the technical and confusing distinctions between larceny, embezzlement and obtaining money or property by false pretenses. The statute as a whole attempts to deal with all forms of "stealing" including false pretenses and as the title to the act states, in repealing more than fifty statutes, relates to "offenses against property." Laws Mo. 1955, p. 507. But the substantive offense is stealing, not deceit (which is the means by which a theft is accomplished and need not be defined in the act). The statute does not broaden the crime of larceny or "designate as criminal that which was previously innocent" (State v. Gale, Mo., 322 S.W.2d 852), but as a consideration of the information and record will plainly illustrate "to intentionally steal the property of another * * * by means of deceit" is a species of the ancient and well known offense of obtaining money or property by false pretenses (RSMo 1949, § 561.370, V.A.M.S.) and the legislature has not violated any principle of constitutional law in enacting this same offense in a modern, simplified form.

As further background and insofar as material to six other assignments of error, the information charges that Lola "in the City of St. Louis, between June 20, 1959 and the 5th day of February 1961, did unlawfully, feloniously and intentionally steal, take and carry away" $79,661.00, the property of Hollybrook Land Company in the care and custody of Robert N. Amacker, "by means of certain false pretenses, representations and deceit, to wit" that Lola falsely represented to Amacker that she "was the executrix under the will of one Magnolia J. Ward (Pittman) deceased; that there was certain real and personal property which were assets in the estate * * * that the value of the assets in said estate was greatly in excess of the amount of the monies of the Hollybrook Land Company * * * so obtained as aforesaid from Robert Amacker, and that the advancement of said monies by the said Robert Amacker to said Lola Lorene Perkins * * * would enable her to close and settle the aforesaid estate, and that she would then so close and settle said estate and would, out of the assets of said estate" repay the sums advanced by Amacker, that said representations and pretenses were known to Lola to be false and untrue and were relied on by Amacker with the result that Lola got and stole $79,661.

It will be observed that the first quotation from the information in classic language charged the former offense of grand larceny (RSMo 1949, § 560.155, V.A.M.S.), while, as indicated, the longer quotation in time honored form charged the offense of obtaining money by false pretenses, RSMo 1949, § 561.370, V.A.M.S. Added to the information is other language from the revised statute (§ 560.156 (sub. 2)), such as "deceit," indicating plainly that the charge is under the statute and includes stealing by deceit. It is not necessary to consider the claims of error in detail, it is sufficient to say that the information meets the challenge of vagueness, indefiniteness and due process even though the theft by deceit was alleged to have occurred over a period of more than a year and a half, "between June 20, 1959 and the 5th day of February 1961." Sup.Ct.Rule 24.11(5) (6), V.A.M.R. It was not necessary to negative the existence of the estate of Magnolia J. Ward (V.A.M.S. § 545.030) and the quotations refute the assertion that the information "on its face indicates that the prosecution is predicated upon the failure of the defendant to pay a debt." It is neither necessary nor desirable that informations under the revised statute be reduced to a rigid formula; it is sufficient to say that this information plainly describes an offense defined in the statute and, as will appear from a recital of the facts, concisely covers the conduct relied on as constituting a theft by deceit. Therefore the court did not err in denying the defendant's motion for a bill of particulars. While particular informations have not been specifically approved, cases

supporting the validity of this information under the revised statute are State v. Samis, 296 Mo. 471, 246 S.W. 956; State v. Mandell, 353 Mo. 502, 183 S.W.2d 59 and State v. Fenner, Mo., 358 S.W.2d 867.

The prosecuting witness is Robert N. Amacker, 63, a lifelong resident of Lake Providence, Louisiana. Modestly Mr. Amacker calls himself a farmer, he is in fact a Louisiana planter and has an annual personal income of $30,000. He is also interested in an insurance company, a grain elevator, a cotton gin and other enterprises and has had thirty-six years' experience loaning money. He graduated from high school, attended the University of Arkansas one year and Soule Business College six months. Hollybrook Land Company is an Amacker family-owned corporation and owns 9300 acres of land on the Mississippi River upon which it "grows" cotton, rice, soybeans, wheat, oats and corn, and sometimes the corporation loans money. Mr. Amacker is treasurer of the corporation and had almost unlimited authority in the handling of its money. He had known the appellant, Lola Perkins, since 1927 when she lived in the vicinity of Lake Providence and had "a day squad" and hoed and picked cotton for other planters. Even in those days, 1927 to 1935, when he knew she had but little if any property, Mr. Amacker made Lola several loans of $500 to $1500 which she repaid with interest. He had also known Lola's mother, Amelia Lewis (later known as Drucilla Green), and he had a recollection of Magnolia Ward but it was "more of a name." After 1935 these people passed out of Mr. Amacker's life for almost twenty-five years, reappearing in 1959.

The appellant, Lola Lorene Perkins, was the founder and Supreme Ruler of the United Rock of Charity, a charitable organization (said to have a charter from the State of Missouri) engaged in raising money for churches and "to help the needy." A large part of the Amackers' $267,800.82 passed through this charitable corporate organization. There were a large number of officers,

sometimes as many as 22, "Honorable Daughter" the equivalent of a vice-president, "Finance Captain" and "assistant deputy finance captain," the latter had the duty of "(h)andling a little of the property and part of these automobiles" and sometimes "I was appraiser on some of it." One witness did remember an instance in which at Lola's direction funds of $420 from the United Rock kept a needy widow from "being set out of doors." Then two or three officers in the organization remembered that funds were advanced to churches, the Sunny Mount Missionary Baptist Church in St. Louis and the Harris Temple south of Little Rock. By a down payment of $2,500 a $100,000 farm was purchased in Arkansas and down payments were made on numerous pieces of property in St. Louis and Little Rock. It turned out that a select group of officers in United Rock, including Lola, lived in the St. Louis properties rent free. At least five automobiles, Cadillacs and Chrysler Imperials, were purchased on credit plans and Lola and her retinue used them "to go back and forward to Little Rock and render programs there and here." To close out the Little Rock "chapter" and eventually the Magnolia Ward will the charity engaged the famous singer of spirituals, Mahalia Jackson, and in the end that performance cost Mr. Amacker an additional $11,900.

This is a very brief but necessary background to the essential facts upon which Mr. Amacker claims to have relied and the circumstances in which he advanced from his personal funds and the funds of the land company $267,800.82 from which Lola is alleged to have stolen $79,661.00. It is neither possible nor necessary to attempt even a résumé of the testimony, there are three volumes of record, twenty-three witnesses—all of them state's witnesses—and the circumstances are intricate and bizarre beyond description. Lola did not testify and may not have been able to call any witnesses because when exposure came all her friends and associates deserted her and the Rock of Charity and testified for the state. And if

any of them had handled or received any of the Amacker money they claimed that they immediately turned it over to Lola, to the United Rock of Charity or spent it as directed by her. Merely to illustrate by a single interpolation: Lucille Wilson, who was intimately connected with Lola and the Rock of Charity throughout the years and who typed, witnessed or notarized many of the documents, went to the Boatmen's Bank on three occasions with Mr. Amacker when he procured cashier's checks payable to Lucille in the sums of $10,350.00, $17,560.00 and $10,000.00. Lola was waiting outside the bank and they immediately went to the Manchester Bank where cashier's checks in smaller denominations were issued for the $10,350 and $17,560 items and these were delivered to Lola. When Lucille got the $10,000 check she intended to give it to Mr. Glass (who sold, financed and repossessed the automobiles) "but there was some conflict between Mr. Glass and Mrs. Perkins and at that time it had not been straightened out" and so she gave that check to Lola. But as indicated, it is not possible to reduce this record and its 44 assignments of error to a reasonable, sensible statement of facts and it will have to suffice to say that Amos and Andy and all the characters of Octavus Roy Cohen in their finest hours never dreamed of so fantastic a scheme to entrap the unwary and the greedy. And never before were experienced bankers, lawyers, planters and money lenders so completely and successfully gulled by such outlandish characters armed with such preposterous documents.

No one in the probate court remembers who brought the document in but a deputy clerk with 28 years' experience testified that the will of Magnolia J. Ward was filed for probate on October 17, 1958. There were three witnesses to the will, Mildred Aldridge, Ollie Love and E. J. Lewis. The clerk, however, took the solemn oath of Mildred Aldridge that she witnessed the will and saw Magnolia Ward sign and execute it. The clerk then took the affidavit of Lucille Wilson that she had prepared the instrument at the direction and request of Magnolia and that she had witnessed its execution. Upon this proof and her application letters testamentary, without bond, were issued to Lola. The fact was that Magnolia Ward died in 1953 and the instrument purporting to be her will was written in longhand by Lola, typed by Lucille in the office of a lawyer where she was a secretary, and the testatrix' signature forged by Lola in 1958. Mildred Aldridge personally signed the document as a witness, as did E. J. Lewis, according to Mildred, but Ollie Love called Lucille on the telephone and said that she was unable to get to the office and asked Lucille to sign her name for her, which she did. Subsequently Ollie denied that she had authorized Lucille to sign her name as a witness. This instrument, purporting to be the will of Magnolia Ward, is a lengthy document, and after the introduction, because they are "major devisees," contains a biography of Matthew and Lola Pittman. The will certifies that even before her death Magnolia nominated Lola "as my Attorney in Fact, with full power and authority to act" with reference to properties in Louisiana. There are numerous restrictions against Lola's pledging property or "dealing with real estate agents." There are provisions for selling various and sundry pieces of land and giving specified people the proceeds. There are numerous specific bequests of $500 each, "but they must have a $100 of their own to receive it." There are provisions for purchasing homes for numerous people, "costing not over $14,000, including building in the city where Lola P. Pittman and Matthew P. Pittman resides, as of now, St. Louis, Missouri. Homes for lifetime only." There are numerous complicated directions as to mortgages of property and finally the restriction that "No assignments or mortgages on properties belonging to said estate shall be given unless Lola P. Pittman has bought in said properties under the will for $375,000.00 and put said $375. in trust to comply with the orders unders my will." However, Lola was to have final authority in purchasing property

and $30,000 was to "come from the estate for down payment of homes to be purchased for relatives by Lola P. Pittman." Furthermore, "Lola P. Pittman is to have 20% of the entire estate. Ten per cent of said amount to be furnished by a portion of the funds given to Matthew P. Perkins under my will" and "(s)he is to receive $75,000 for her work." Then there is a long provision that "Lola P. Pittman shall set up a National Organization, if possible, that shall be beneficial to the races, and get a charter for the same." In connection with the provision for the national organization there is a requirement that churches, recreation centers and rest homes be built in St. Louis, Little Rock and Lake Providence. Lola was to have five years after Magnolia's death before filing the will, "the will is to be filed for her record sake." There were numerous other directions, bequests and devises but "(a)fter Lola P. Pittman has fulfilled all obligations in the contract between her and me will held by the trustees known to her she is to place in the bank to her account with the witnesses as trustees the balance of the funds from the estate with the bank as her agent to finish the hospital, rest home, orphan homs (sic) recreation center, etc." In connection with the will and its execution, there were inventories and supplemental inventories all duly authenticated by witnesses and acknowledged by Lucille as a notary public. These inventories and appraisals showed real estate in Magnolia's estate of the total value of $75,000, $82,000 and $99,000. Inventoried as real estate were the apartments in which Lola and other members of the United Rock of Charity were living rent free, all of which were eventually foreclosed under second deeds of trust. But, not only was Magnolia dead when the will was executed and not only were the will and the inventories a forgery and false in almost every detail, when Magnolia died in 1953 she was so poor that her friends took up a collection for her burial.

At the same time Lucille typed the will and in connection with it she also typed the "contract" of December 6, 1951, signed or witnessed by Magnolia, Lola, Mildred Aldridge and E. J. Lewis. This document was to be presented to the court "if necessary, but is not to become a public record" and Lola was admonished "to avoid all possibilities of trickery, or liens or claims against the estate or the money on deposit for the estate." Again, in this document, there are elaborate provisions for building churches, buying homes and operating a national organization and the clauses most frequently referred to by Robert Amacker: "The Trustees shall remain unknown until the day of settlement and the name of the bank where the Trustees have the funds on deposit shall remain unknown to anyone," a violation of this and other secrecy provisions enjoined upon Lola constituted a breach of the will and contract.

There were numerous other documents, affidavits, testimonials and declarations, all presented at one time or another to Mr. Amacker and some of them signed or witnessed by him, all of them hinting at or mentioning large sums of money, as the certificate of Drucilla Green (Lola's mother) that "the funds held by me to date is in the amount of $425,000.00," and in April 1959, Lucille's statement to Mr. Amacker that "(e)ach trustee has $100,000.00 to be turned over to Lola Perkins, after she has complied with the terms of the will." There was Lola's discussion with an official of the St. Louis Union Trust Company about a "living trust" of $400,000.00 and finally Lola's coy hint to Mr. Amacker's lawyer-banker, from Arkansas, when in 1960 she was trying for an additional $67,-000, that "there was over $800,000.00 held in a bank, cash money available when this was completed, that could be used to pay off all of these debts," but "the claim was always made that if she revealed that (the whereabouts of these vast sums of money) to us, she would forfeit her rights under this will. It had to be kept secret from anybody but her or the trustees in this thing." As stated, there were all these other documents and requests for funds to

comply with the will, the contract or to meet the obligations of the United Rock of Charity, but Mr. Amacker's principal reliance was on the will and the contract.

In February 1959 Lola and her mother appeared in Lake Providence and asked Mr. Amacker for a loan of $500 in connection with a church in Arkansas. It was then that she casually informed Mr. Amacker that she was executor of the will of Magnolia Ward and "(t)hat it was a grant, she called it a grantee will" but there were certain performances to be done before she could close the will out. Between that date, February 12, 1959, and March 1, Mr. Amacker loaned Lola $2,436 for which he took a mortgage on Lola's mother's home. Thereafter, after communications from Lucille, Lola and others requesting loans or advances to the United Rock of Charity or to comply with the will and contract, as on June 15, 1959, $16,771.00 "conforming to the will" and to complete Harris Temple, Mr. Amacker finally supplied the total sum indicated. Repeatedly, he said, this time after a three months' stay in St. Louis, "and during that time I gave her considerably more money, all on the proposition that she was organizing the United Rock of Charity, and she was carrying out the provisions of the will and the contract." Finally, even Mrs. Amacker, in Robert's absence, borrowed $2,000 from her father, in response to a telephone call, and sent that to Lola. Mr. Amacker and his associates made inquiries and investigations, other than exhaustively investigating the probate court proceedings, but they were all unable to "find the money." Nevertheless, said Robert, "I believed she was telling me the truth, and I believed as she told me time and again that if such an investigation was made, it would violate the provisions of the contract and will, and that these statements could not be revealed until such a time as the day of settlement."

It is not necessary to trace the history and disposition of each or even most of the innumerable advances by Amacker, Lola is charged between the dates of June 20, 1959, and February 5, 1961, with stealing $79,661. An official of the Manchester Bank identified two series of cancelled cashier's checks, May 23 and May 31, 1960, totaling $27,610, payable to Lola. A St. Louis Western Union employee identified nine separate telegraphic orders of cash to Lola from Mr. Amacker totaling $11,390. These two items, directly traced to Lola, total $39,000.

 Without pointing to specific facts and circumstances and indicating permissible inferences, this very brief résumé of the evidence warrants and supports the jury's finding of Lola's guilt of the offense of stealing by deceit. State v. Samis, 296 Mo. 471, 246 S.W. 956; State v. Mandell, 353 Mo. 502, 183 S.W.2d 59; 2 Wharton, Criminal Law & Procedure, Sec. 595, pp. 342–343. This is not a case in which the state sought to show that Lola had victimized third parties, (Annotations 80 A.L.R. 1306, 78 A.L.R.2d 1359) all the transactions and all the testimony was concerned with advances from Mr. Amacker to Lola, and insofar as the testimony dealt with her separate transactions with him, and insofar as any instructions dealt with this subject, the jury could properly consider the circumstances as indicating Lola's felonious intent. State v. Mandell, supra; 22 Am.Jur. (False Pretenses) Sec. 109, p. 506. Again without pointing to specific testimony, it is indeed a fair inference from the record that a large number of the state's witnesses, Lola's former friends and associates in her good works, were privy to and a part of her evergrowing scheme and "that by concert of action they had engaged in that fraudulent scheme together" (State v. Samis, 296 Mo. l. c. 486, 246 S.W. l. c. 960) and, therefore, of course the participation and conduct of all the parties in the pursuit and execution of their joint mission, in Arkansas and Louisiana, as well as Missouri, was admissi-

ble against Lola. The fact that the prosecuting witness was credulous and even acted against the advice of friends and counsel is no defense and it was not error to refuse the appellant's instruction requiring Mr. Amacker to exercise ordinary care and to make a timely investigation. State v. Mandell, supra; State v. Keyes, 196 Mo. 136, 93 S.W. 801, 6 L.R.A.,N.S., 369.

■ There were eleven other assignments in the appellant's motion for a new trial directed to the giving and refusal of instructions. However, the principal instruction followed the charge as set forth in the information and in essence hypothesized the evidence as it has been detailed. The instruction appears to have been patterned after the instructions set forth in State v. Keyes and State v. Mandell, supra, and is not prejudicially erroneous for any of the reasons urged in the motion for a new trial. "The failure of the State to prove and the instruction to require the jury to find the falsity of each and every pretense alleged in the information was not fatal to the prosecution so long as the proof established and the instruction required the jury to find one or more of the false pretenses alleged." State v. Montgomery, Mo., 116 S.W.2d 72, 74.

The truly perplexing problem upon this appeal involves the court's action in "reproving," as the state calls it, defendant's trial counsel and finally in finding him guilty of contempt of court. The problem arose in the very lengthy cross-examination of Mr. Amacker, he had been explaining why he had not investigated the probate court records or consulted lawyers (relying on Lola's admonitions for the necessity of secrecy) and implied that on a trip to St. Louis defendant's counsel and others had not been too cooperative in supplying helpful information. To refresh Mr. Amacker's memory counsel produced a letter from another lawyer who wrote Amacker on behalf of Lola whereupon, in the presence of the jury, there was a colloquy between

the court, state's counsel and defense counsel as to whether the state's attorney was entitled to have the document and finally introduced the whole of it in evidence. Defense counsel was objecting and refused to hand over the letter, the court ordered him "to pass the exhibit to Mr. Bantle" and in the course of further objecting counsel said, "I object to the remarks of the court, and ask for a mistrial on the account of the bias and prejudice on account of this court." Whereupon the court said, "Don't make that kind of remark, or you better withdraw that, Mr. Weinberger" and when counsel attempted to make further objections the court warned counsel to "reflect upon what you said. I want you to calm yourself down, and see if you want that remark to stand in this record, in the presence of this jury." A lengthy colloquy and objection ensued and then the record recites: "The following proceeding took place at the bench without the hearing of the jury: The Court: And I judge Mr. Weinberger in contempt of court for the remark he made, and failure to comply with the order of the court, and I will make the ruling thereon subsequently and not in the presence of the jury at this time." It does not appear what disposition the court finally made of the contempt adjudication, the colloquy continued, the court obtained a case supposedly supporting its action as to the use of the letter and then he cautioned the jury at some length, "and I give you this admonition. I caution you gentlemen, and I charge you as a jury that you don't base your verdict upon nor try the attorney for the defendant. Only the defendant is the person that is on trial here now." The court cautioned the jury against basing a verdict on anything he said and likewise on anything counsel said and concluded, "I deny the remarks that he made. You gentlemen have been here. There are twelve of you. You have seen everything that I have done or said during this trial. You may resume, gentlemen, and I let the order that I previously made stand." Defense

counsel produced the letter, the state's attorney had it identified and over objection read it to the jury. The trial was then near its end, there was but one other witness, and there were no further clashes between court and counsel.

 It is not necessary to consider whether, the letter having been used for the avowed purpose of refreshing the witnesses' memory, it was as a matter of right subject to inspection and use by opposing counsel. There is an annotation of over 130 pages on the subject in 82 A.L.R.2d 473. The letter, written in April 1959, addressed to Mr. Amacker, stated that it was "being written at the request of" Lola who was "consulting with me at this time in my office." The letter was a plea to Mr. Amacker for "a few more days' delay" so that she could "comply strictly and absolutely to the terms of the will." As previously indicated, regardless of the original purpose counsel had in producing the letter, since it was from Lola to Amacker and was directly concerned with this transaction, it was admissible in evidence. And it is not proposed here to adopt the expedient of "scoring" the court's deportment (62 A.L.R.2d 166, 172), or to borrow a favorite phrase of the court's to "scold" the court. It is sufficient to say that throughout the trial the court was unduly sensitive, even tetchy concerning the dignity of the forum, and it is not understandable why the court "reproved" or permitted any of its disciplining of counsel to occur in the presence of the jury thereby risking "the effect it might have on *the rights of the parties* with the jury." State v. Hudson, 358 Mo. 424, 215 S.W.2d 441, 443, italics supplied. It is not proposed, furthermore, to enter upon a full scale consideration of all the factors entering into the general rules, "(e)ach case is considered on its own facts and decided by general principles rather than by specific rules."

Annotation 62 A.L.R.2d 1. c. 183 (This one hundred page annotation fully covers the subject: "Remarks or acts of trial judge criticizing, rebuking, or punishing defense counsel in criminal case, as requiring new trial or reversal.") The episode is not comparable to the manifestly prejudicial conduct in State v. Davis, 284 Mo. 695, 225 S.W. 707 or "the humiliating and shameful situation" in State v. Montgomery, 363 Mo. 459, 251 S.W.2d 654. The episode here and the case more closely resemble the actions in State v. Rack, Mo., 318 S.W.2d 211, State v. Miller, 364 Mo. 320, 261 S.W.2d 103 and State v. Montgomery, Mo., 223 S.W.2d 463. In short, applying the general principles, the circumstances in their totality do not constitute "error sufficiently grave to call for a reversal or a new trial." 62 A.L.R.2d 1. c. 181.

As stated, there are forty-four assignments of error in the appellant's motion for a new trial, five or more of the assignments are lacking in specificity and statement of "the specific grounds or causes therefor" (Sup.Ct.Rule 27.20(a)), all other assignments of error have been considered and explicitly or impliedly overruled. The verdict of the jury was responsive (RSMo 1959, § 560.161, V.A.M.S.), there was allocution and the sentence and judgment are responsive to the verdict (Sup.Ct.Rules 27.08, 27.09) and for the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.